ORIGINAL

Approved: _____
          JONATHAN E. REBOLD
          Assistant United States Attorney

Before:   HONORABLE ONA T. WANG
          United States Magistrate Judge **20 MAG   2797**
          Southern District of New York

- - - - - - - - - - - - - - - - x
                                 :    **COMPLAINT**
UNITED STATES OF AMERICA         :
                                 :    Violation of
       - v. -                    :    13 U.S.C. § 305;
                                 :    18 U.S.C. §§ 553, 1343,
MACK DUODU,                      :    1956, 1957, 1960, 2312,
                                 :    2313, 2314, 2315 and 2
              Defendant.         :
                                 :    COUNTY OF OFFENSE:
                                 :    BRONX
                                 :
                                 :
- - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

          MICHAEL H. MACDONALD, being duly sworn, deposes and says
that he is a Special Agent with the Homeland Security
Investigations, and charges as follows:

COUNT ONE
(Exportation of Stolen Vehicles)

          1.   From at least in or about March 2018, up to and
including at least in or about June 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
would and did willfully and knowingly export and attempt to
export motor vehicles, knowing the same to have been stolen, to
wit, DUODU arranged for stolen vehicles to be exported to West
Africa via shipping container, knowing that said vehicles were
stolen.

          (Title 18, United States Code, Sections 553(a)(1) and 2.)

COUNT TWO
(Transportation of Stolen Vehicles)

2.    From at least in or about March 2018, up to and
including at least in or about June 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
did transport in interstate and foreign commerce motor vehicles,
knowing the same to have been stolen, to wit, DUODU arranged for
stolen vehicles to be exported to West Africa via shipping
container, knowing that said vehicles were stolen.

(Title 18, United States Code, Sections 2312 and 2)

COUNT THREE
(Sale and Receipt of Stolen Vehicles)

3.    From at least in or about March 2018, up to and
including at least in or about June 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
did receive, possess, conceal, store, barter, sell, and dispose
of motor vehicles which had crossed State boundaries after
having been stolen, knowing the same to have been stolen, to
wit, DUODU arranged for stolen vehicles to be exported to West
Africa via shipping container, knowing that said vehicles were
stolen.

(Title 18, United States Code, Sections 2313(a) and 2)

COUNT FOUR
(Transportation of Stolen Goods)

4.    From at least in or about March 2018, up to and
including at least in or about November 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
did transport, transmit, and transfer in interstate and foreign
commerce goods, of the value of $5,000 and more, knowing the
same to have been stolen, converted and taken by fraud, to wit,
DUODU received and possessed in New York State motor vehicles
and household goods, valued in excess of $5,000, that were
stolen from outside of New York State, and that were transported
into New York, and from New York to West Africa, knowing those
items were stolen.

(Title 18, United States Code, Sections 2314 and 2)

2

COUNT FIVE
(Sale and Receipt of Stolen Goods)

5.    From at least in or about March 2018, up to and
including at least in or about June 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
did receive, possess, conceal, store, barter, sell, and dispose
of goods of the value of $5,000 and more, which had crossed a
State and United States boundary after being stolen, unlawfully
converted, and taken, knowing the same to have been stolen,
unlawfully converted, and taken, to wit, DUODU received and
possessed in New York State motor vehicles and household goods,
valued in excess of $5,000, that were stolen from outside New
York State, and that were transported into New York, and from
New York to West Africa, knowing those items were stolen.

(Title 18, United States Code, Sections 2315 and 2)

COUNT SIX
(Submitting False Export Information)

6.    From at least in or about March 2018, up to and
including at least in or about June 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
would and did knowingly submit false and misleading export
information through the Shippers Export Declaration and the
Automated Export System, to wit, DUODU submitted false and
misleading information about the nature and owner of cargo
inside shipping containers bound for West Africa.

(Title 13, United States Code, Section 305, and
Title 18, United States Code, Section 2.)

COUNT SEVEN
(Wire Fraud)

7.    In or about February 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds, for the purpose of
executing such scheme and artifice, to wit: DUODU used stolen
credit card information, without the true owner's knowledge or

3



consent, to make a rental payment for a Westchester County
storage unit used by DUODU.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT EIGHT
### (Money Laundering)

8.   From at least in or about March 2018 up to and
including at least in or about November 2018, MACK DUODU, the
defendant, in the Southern District of New York and elsewhere,
knowing that the property involved in a financial transaction
represented the proceeds of some form of unlawful activity,
conducted and attempted to conduct such a financial transaction
which in fact involved the proceeds of specified unlawful
activity, to wit, wire fraud, in violation of Title 18, United
States Code, 1343, knowing that the transaction was designed in
whole and in part to conceal and disguise the nature, the
location, the source, the ownership, and the control of the
proceeds of said specified unlawful activity, to wit, DUODU
owned and controlled multiple United States bank accounts, which
DUODU knowingly used to receive the proceeds of various online
romance fraud schemes, and then repeatedly forwarded those
proceeds, minus a fee, to bank accounts held in West Africa,
China, the United Arab Emirates, and elsewhere, with the intent
to conceal and disguise the location, source, ownership and
control of the proceeds of the romance fraud scheme.

(Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.)

## COUNT NINE
### (International Money Laundering)

9.   From at least March 2018 up to and including at
least in or about November 2018, in the Southern District of New
York and elsewhere, MACK DUODU, the defendant, transported,
transmitted, and transferred, and attempted to transport,
transmit, and transfer, a monetary instrument and funds from a
place in the United States to and through a place outside the
United States, knowing that the monetary instrument and funds
involved in the transportation, transmission, and transfer
represented the proceeds of some form of unlawful activity and
knowing that such transportation, transmission, and transfer was
designed in whole and in part to conceal and disguise the
nature, the location, the source, the ownership, and the control
of the proceeds of specified unlawful activity, to wit, wire
fraud, to wit, DUODU owned and controlled multiple United States

bank accounts, which DUODU knowingly used to receive the
proceeds of various online romance fraud schemes, and then
repeatedly forwarded those proceeds, minus a fee, to bank
accounts held in West Africa, China, the United Arab Emirates,
and elsewhere, with the intent to conceal and disguise the
location, source, ownership and control of the proceeds of the
romance fraud scheme.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

<u>COUNT TEN</u>
(Operation of an Unlicensed Money Transmitting Business)

        10.  From at least in or about March 2018 up to and
including at least in or about November 2018, in the Southern
District of New York and elsewhere, MACK DUODU, the defendant,
and others known and unknown, knowingly conducted, controlled,
managed, supervised, directed, and owned all and part of an
unlicensed money transmitting business, to wit, DUODO repeatedly
accepted United States dollars that were deposited, wired, or
otherwise transferred by third parties into bank accounts that
DUODU controlled in the United States, and then transferred
those funds, minus a fee, to bank accounts controlled by others
in West Africa, China, the United Arab Emirates, and elsewhere.

        (Title 18, United States Code, Sections 1960 and 2)

<u>COUNT ELEVEN</u>
(Engaging in Monetary Transactions in Property Derived From Wire
Fraud)

        11.  From at least in or about March 2018 up to and
including at least in or about November 2018, MACK DUODU, the
defendant, in the Southern District of New York and elsewhere,
in an offense involving and affecting interstate and foreign
commerce, knowingly engaged and attempted to engage in a
monetary transaction in criminally derived property of a value
greater than $10,000 that was derived from specified unlawful
activity, to wit, wire fraud, to wit, DUODU owned and controlled
multiple United States bank accounts, which DUODU knowingly used
to receive the proceeds of various online romance fraud schemes,
and then repeatedly forwarded those proceeds, via wire transfers

in excess of $10,000, to bank accounts held in West Africa, China, the United Arab Emirates, and elsewhere.

(Title 18, United States Code, Sections 1957 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

12. I am a Special Agent with Homeland Security Investigations ("HSI"), and have been so employed for approximately twelve years. I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my conversations with other law enforcement officers and other individuals, and my examination of reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

13. Since at least June 2018, several agencies, beginning with the New York City Police Department ("NYPD"), and ultimately including the United States Department of Commerce, the New York State Police Department, United States Customs and Border Protection ("CBP") and HSI have been involved in an investigation into MACK DUODU, the defendant, for his participation in a variety of intertwining criminal acts and schemes, including the receipt, storage, and export of stolen vehicles and other goods (the "Stolen Goods Scheme") and the movement and laundering of money derived from online romance schemes, in which victims were induced to send money to bank accounts controlled by DUODO, who then, among other things, forwarded those funds, minus a fee, to bank accounts held in West Africa, China, and the United Arab Emirates (the "Romance Fraud/Money Laundering Scheme"). I have personally been involved in this investigation since at least August 2019.

## The Stolen Goods Scheme

14. The investigation has revealed that from at least in or about March 2018 up to and including at least November 2018, MACK DUODU, the defendant, possessed and/or exported stolen vehicles and other goods that were ostensibly paid for using stolen personal identifying information and/or fraudulent credit card information, and that routinely resulted in "charge-backs" to the sellers of said goods, who ultimately provided these items for

nothing in return.  These goods were frequently purchased in states other than New York, and then sent to the Southern District of New York, whereupon DUODO arranged to have them shipped to destinations in West Africa.   The Stolen Goods Scheme generally worked as follows, with some variation between different manifestations of the scheme:

   a. DUODU   and/or   others   (collectively,   the "Conspirators") would communicate by phone and/or online with a United States auto-dealership, usually located outside of New York (the "Auto Dealer"), to negotiate and effect the purchase of a vehicle.   In doing so, the Conspirators would claim to be someone they were not (i.e. a "Victim").   Ultimately, one of the Conspirators would ostensibly pay for the vehicle using a credit card purportedly in the name of the Victim, without the Victim's permission or authority.   The purchase price of said vehicles typically ranged between $6,000 and $26,000.

   b. Meanwhile, DUODU would begin making arrangements with a particular freight forwarding business ("FF Company-1") to have said vehicle shipped to a destination in West Africa.

   c. Once the above-mentioned credit card payment was approved, the Auto Dealer shipped the vehicle to a specified address in the Southern District of New York, whereupon DUODU had the vehicle moved to a shipping vessel, which then transported the stolen vehicle to West Africa.

   d. Sometime after the vehicle was already en route to West Africa, the credit card payment would be reported as fraudulent, resulting in a "charge back" to the Auto Dealer.   As such, the Auto Dealer would go unpaid for the sale of the vehicle and the cost of having said vehicle transported to the Southern District of New York.

   15. By way of example, the investigation revealed the following about several stolen vehicles received and exported by MACK DUODU, the defendant, in April 2018:

   a. Based on a review of records maintained by the South Brunswick, New Jersey Police Department, I have learned, among other things, that on or about March 14, 2018, someone holding himself out as a particular individual ("Victim-1"), of an address in North Carolina (the "NC Residence") used a credit card in the name of Victim-1 ("Credit Card-1") to purchase a particular Mercedes car ("Mercedes-1"), for over $29,000, from a particular New Jersey-based Auto Dealer (the "NJ Auto Dealer").  Approximately

one month later, the NJ Auto Dealer learned that the payment had been approved.  As such, and at the request of the ostensible purchaser, the NJ Auto Dealer shipped Mercedes-1 to the attention of Victim-1, at "Apartment B" in a residential building in the Bronx, New York ("Bronx Address-1").  Additionally, title of Mercedes-1 was transferred to Victim-1.  However, the charges to Credit Card-1 were later reported as fraudulent and charged back to the NJ Auto Dealer, such that the NJ Auto Dealer went unpaid for the sale and shipment of Mercedes-1.

b.   Based on a review of records maintained by the Addison, Illinois Police Department, I have learned, among other things, that on or about March 15, 2018, someone holding himself out as Victim-1 of the NC Residence used another credit card in the name of Victim-1 ("Credit Card-2") to purchase a particular Mercedes car ("Mercedes-2"), for over $25,000, from a particular Illinois-based Auto Dealer (the "Illinois Auto Dealer").  A representative at the Illinois Auto Dealer indicated that a person claiming to be Victim-1 communicated by email and by phone, and sent the Illinois Auto Dealer a North Carolina driver's license bearing the name, address (i.e. the NC Residence), and photograph of Victim-1 (the "NC Driver's License").  At the request of the ostensible purchaser, the NJ Auto Dealer shipped Mercedes-1 to the attention of Victim-1, at "Apartment 4P" at Bronx Address-1.  Additionally, title of Mercedes-1 was transferred to Victim-1 of the NC Residence.  However, the charges to Credit Card-1 were later reported as fraudulent and "charged back" to the Illinois Auto Dealer, such that the Illinois Auto Dealer went unpaid for the sale and shipment of Mercedes-2.  The Illinois Auto Dealer further reported that two additional vehicles were purportedly purchased by Victim-1 – a Hyundai ("Hyundai-1") for over $15,000 on March 15, 2018 and another Mercedes ("Mercedes-3") for over $15,000 on April 5, 2018 – using other credit cards, purportedly in the name of Victim-1.  Hyundai-1 and Mercedes-3 were subsequently sent by the Illinois Auto Dealer to a specified address in the Bronx, New York.  The purchases of Hyundai-1 and Mercedes-3 were later reported as fraudulent, and charged back to the Illinois Auto Dealer, such that the Illinois Auto Dealer went unpaid for the sale and shipment of these vehicles.

c.   Based on an interview with a representative at FF Company-1 ("FF Rep-1") and a review of records maintained by FF Company-1, I have learned the following, in substance and in part:

i.   FF Rep-1 identified as "Mack Duodu" an individual depicted in a New York State government photograph of MACK DUODU, the defendant.  FF Rep-1 further stated that DUODU is

the owner of "Mac's Auto," which employs FF Company-1 to ship vehicles from the United States to West Africa.

      ii. FF Company-1 has prepared freight forwarding paperwork for multiple shipments at the behest of Mac's Auto. In each case, FF Company-1 has dealt exclusively with DUODU, who in each case, personally provided FF Company-1 with the payment and all necessary documents required by FF Company-1 to coordinate shipments on behalf of DUODU. On some occasions, MACK would personally visit FF Company-1. On others, he would communicate via email, using email address "macsautos@gmail.com" and signing his emails with the name "Mack."

      iii. On or about March 26, 2018, DUODU emailed FF Company-1 to arrange for the April 9, 2018 shipment of Mercedes-1 and Mercedes-2, from a shipping port in Newark, New Jersey to a shipping port in Lagos, Nigeria. In email correspondence, DUODU provided the Vehicle Identification Number ("VIN") information for Mercedes-1 and Mercedes-2, and, when providing the value of each vehicle, DUODU provided the exact purchase price that was previously negotiated with NJ Auto Dealer-1 and Illinois Auto Dealer-1.

      iv. DUODU thereafter provided FF Company-1 with copies of the titles for Mercedes-1 and Mercedes-2 (each listing Victim-1 as the owner). DUODU also indicated that "Mac's Auto" was the United States Principal Party of Interest ("USPPI") for each of the vehicles being shipped. DUODUO was required to provide the title and USPPI information so that FF Company-1 could provide these records to United States Customs and Border Protection ("CBP") through the Automated Export System ("AES").[1]

      v. In March 2018, and in compliance with the Export Administration Regulations, which requires that a USPPI must provide Power of Attorney ("POA") or other written instruction authorizing the freight forwarder to file paperwork via AES, DUODU submitted a POA form authorizing FF Company-1 to file shipping documents on behalf of Mac's Auto (the "Mac's Auto POA"). The Mac's Auto POA was signed by a witness, contained a raised seal, and listed DUODU as the owner of Mac's Auto.

---

[1] Based on my training and experience, I know that a USPPI is the person or legal entity in the United States that purportedly receives the primary benefit – monetarily or otherwise – from the export. Typically, the USPPI is the seller of the item being shipped (and not simply the company arranging for the shipment).

vi. Mercedes-1 and Mercedes-2 were ultimately shipped from the United States to Lagos, Nigeria on April 9, 2018 (the "April 9 Shipment").

vii. DUODU also arranged for FF Company-1 to handle the April 24, 2018 shipment of two additional stolen vehicles – Hyundai-1 and Mercedes-3 – from the Port of Newark, New Jersey to a port in Ghana (the "April 24 Shipment").

1. For Hyundai-1, DUODU listed "Mac's Autos" as the USPPI, while for Mercedes-3, DUODU listed "Victim-1" as the USPPI.

2. Regarding Mercedes-3, DUODU provided FF Company-1 with a POA form, purportedly provided by Victim-1, giving FF Company-1 authorization to file the requisite shipping paperwork with AES (the "Victim-1 POA"). The Victim-1 POA form listed Victim-1's name and home address. However, the Victim-1 POA left blank an area for a witness to sign and lacked a raised seal.

3. Regarding Mercedes-3, DUODU also provided a purported copy of a Ghanaian passport for Victim-1 (the "Victim-1 Passport"), which stated that Victim-1 was 43 years old, included a photograph of a male that appeared consistent with a 43-year-old individual (the "Victim-1 Passport Photo"), and which bore a particular nineteen digit alpha-numerical serial number (the "Victim-1 Passport Serial Number"), which appears immediately after the purported passport number at the bottom of the page.

16. Based on my training and experience, I know that the Victim-1 Passport Serial # is fraudulent. For example, it contains an "F" (designating "Female") in a portion of the number where a legitimate serial number would reflect an "M" since Victim-1 is a male.

17. Based on a review of records maintained by FF Company-1 and corresponding police reports, I learned that, in addition to the April 9 Shipment and the April 24 Shipment, MACK DUODU, the defendant, arranged for at least three additional vehicle shipments by FF Company-1 between May 2018 and June 2018. Each shipment contained at least one vehicle that was reported stolen in the same manner as the above-mentioned vehicles (i.e., paid for with credit cards that ultimately resulted in charge-backs to the seller), including additional stolen vehicles ostensibly purchased by Victim-1. In each case, the stolen vehicle

was originally sent by the seller to an address in the Southern District of New York, before ultimately arriving at a United States port, designated for shipment to West Africa.

     a.   One such vehicle, a Toyota Avalon ("Toyota-1"), was ostensibly purchased in the name of a second individual ("Victim-2"); when DUODU arranged for the shipment of this vehicle, he listed the USPPI as Victim-2, with a purported home address in California, and a particular phone number with a "646" area code (the "646 Phone Number"). Regarding Toyota-1, DUODU provided FF Company-1 with a POA form, purportedly provided by Victim-2, giving FF Company-1 authorization to file the requisite shipping paperwork with AES (the "Victim-2 POA"). The Victim-2 POA form listed Victim-2's name and purported home address. However, the Victim-2 POA form left blank an area for a witness to sign and lacked a raised seal.

     b.   DUODU also arranged for the June 16, 2018 shipment (the "June 16 Shipment") of three additional stolen vehicles, each purportedly purchased by a third individual ("Victim-3"). Among other things, DUODU submitted to FF Company-1 a POA form, where Victim-3, of a particular address in Ohio (the "OH Residence"), purportedly gave FF Company-1 authorization to file the requisite freight forwarding paperwork with AES (the "Victim-3 POA"). Much like the Victim-1 POA, the Victim-3 POA left empty the portion of the form designated for a witness's signature and was not sealed or otherwise notarized. DUODU further provided a purported copy of a Ghanaian passport for Victim-3 (the "Victim-3 Passport"), which contained a photograph of a black male (the "Victim-3 Passport Photo"), and which bore a particular nineteen digit alpha-numerical serial number (the "Victim-3 Passport Serial Number"), which appears immediately after the purported passport number at the bottom of the page. Notably, the Victim-3 Passport Serial Number was identical to the Victim-1 Passport Serial Number (including the errant existence of an "F" where a legitimate male passport would instead have featured the letter "M").

     18.   Based on an interview conducted by an HSI agent of Victim-1, I have learned that, among other things:

     a.   Victim-1 is an over 81 year-old male who lives at the NC Residence. Victim-1 is a United States citizen. Victim-1 was born in the United States, has never been to Ghana and does not have Ghanaian citizenship.

11

      b.    Victim-1's visage does not appear consistent with the individual in the Victim-1 Passport Photo, and Victim-1 confirmed that he was not the individual depicted in the Victim-1 Passport Photo.

      c.    Victim-1 further stated, in substance and in part, that Victim-1 did not know anyone named Mack Duodu, that Victim-1 did not purchase or authorize the purchase of any of the above-mentioned vehicles allegedly purchased in Victim-1's name, nor did he provide "Power of Attorney" to MACK DUODU, the defendant, or authorization, generally, for DUODU to ship said vehicles to West Africa.

      d.    Victim-1 further stated that sometime in or about late 2016, Victim-1 lost Victim-1's driver's license.  Victim-1 states that he thereafter received multiple calls from multiple auto dealerships, either asking Victim-1 about or thanking Victim-1 for the purchase of various vehicles that Victim-1 did not buy or attempt to buy.

      19.    Based on a review of records maintained by T-Mobile I have learned that the 646 Phone Number is registered to "Mack Duodu," of an address on file with the New York State Department of Motor Vehicles ("DMV") for MACK DUODU, the defendant.

      20.    Based on my review of a summary of interviews of Victim-3, conducted by law enforcement, I have learned, among other things:

      a.    Victim-3 is an elderly white male – who does not appear in any way like the black male depicted in the Victim-3 Passport – who lives at the OH Residence.

      b.    Victim-3 is neither from Ghana nor does Victim-3 possess a Ghanaian passport.

      c.    Victim-3 believes that in or about May 2018, Victim-3 had his identity stolen.  Specifically, on or about May 14, 2018, Victim-3 received a call from an individual claiming to be a Verizon representative (the "Fraudulent Verizon Rep").  The Fraudulent Verizon Rep claimed to be calling to verify Victim-3's personal information.  At the instruction of the Fraudulent Verizon Rep, Victim-3 provided a photograph of Victim-3's Ohio driver's license (the "Victim-3 Driver's License") to what Victim-3 believed to be a Verizon Fraud Division Website.  The following day, Victim-3 received a telephone from an unknown individual in Kentucky, attempting to verify Victim-3's identity regarding the

credit card purchase of a 2015 Chevrolet Spark. The individual then sent Victim-3 a photograph of Victim-3's driver's license, which was accurate in all respects, except that in place of Victim-3's visage was the visage of a middle-aged black male.

   d. Victim-3 did not purchase or authorize the purchase of that vehicle, or any of the three stolen vehicles on the June 16 Shipment.

   e. Victim-3 does not know MACK DUODU, the defendant, nor did he authorize DUODU or Mac's Auto to ship any of these vehicles on behalf of Victim-3.

   f. In July 2018, Victim-3's driver's license was again used to purchase a vehicle. Specifically, Victim-3 stated that he was contacted by a car dealership from New York State (the "NY Auto Dealer"), and told that a credit card he had used to purchase a 2017 Hyundai was rejected as a fraudulent transaction after first being accepted. The NY Auto Dealer asked for a new credit card to complete the purchase, whereupon Victim-3 notified the NY Auto Dealer that Victim-3 had not attempted or authorized any such purchase.

   21. I have attempted to locate all bank accounts associated with MACK DUODU, the defendant, during the 2018 calendar year, and successfully identified eight such accounts (collectively, the "DUODU Bank Accounts").[2] Despite DUODU's claims to FF Company-1 that he represented Victims 1, 2 and 3, in arranging for the shipment of their vehicles to West Africa, a review of transaction records for the DUODU Bank Accounts did not reveal any financial transactions between DUODU and any of these individuals.

---

[2] Three such accounts are individual accounts held in the name of "Mack Duodu." Three are business accounts held in the name of "Mac's Autos," and list DUODU as the sole signatory. Two additional business accounts are held in the name of "International Trading Places," and list DUODU as the sole signatory. Further, on or about August 7, 2019, I was present for an interview of DUODU, conducted by CBP, upon DUODU's arrival at John F. Kennedy International Airport, following his flight from Nigeria, whereupon DUODU stated, among other things, that DUODU owns and runs a business in the United States called "International Trading Places." DUODU also provided a business card for International Trading Places, which listed the 646 Phone Number as belonging to DUODU.

22.   The investigation further revealed that the Stolen Goods Scheme was not limited to stolen vehicles.

a.   For example, based on my conversations with and reviews of reports generated by an NYPD Detective assigned to this investigation ("DT-1"), I have learned that in or about May 2018, a particular furniture store located in New York ("Furniture Store-1") was a victim of fraud similar to above-mentioned fraudulent purchases of vehicles.   Specifically, a representative at Furniture Store-1 claimed that on May 17, 2018, an individual, who communicated via email and phone, and provided the name "Larry Bills" placed an order of over $7,500 in furniture from Furniture Store-1.   "Larry Bills" provided a particular credit card number for the purchase, and requested that the furniture be sent to a particular storage unit (the "DUODU Storage Unit") at a storage facility in Westchester County (the "Westchester Storage Facility").   Furniture Store-1 complied with this request. However, after shipping the furniture to the DUODU Storage Unit, the credit card charge was reported as fraudulent, resulting in a charge-back to Furniture Store-1.

b.   Based on my review of records maintained by the Westchester Storage Facility, I learned that the DUODU Storage Unit was rented by MACK DUODU, the defendant. The Westchester Storage Facility also provided a copy of DUODU's New York State Driver's License, which revealed a particular home address in Yorktown Heights, New York (the "DUODU Yorktown Heights Residence").   The Westchester Storage Unit further provided an invoice for a shipment of shingles (the "DUODU Shingles Shipment") that had been sent to the DUODU Storage Unit from a particular retailer in Connecticut (the "CT Shingles Dealer").

c.   Based on an interview by DT-1 of a representative at the CT Shingles Dealer ("Shingles Rep-1"), I learned that in or around June 2018, an individual, who communicated via email and phone, and provided the name "Larry Bills" placed an order for over $3,000 in HD-30 Mission Brown Timberline Roofing Shingles from the CT Shingles Dealer. "Larry Bills" provided a particular credit card number for the purchase, and requested that the furniture be sent to the DUODU Storage Unit.   However, after the CT Shingles Dealer shipped the shingles to the DUODU Storage Unit, the credit card charge was reported as fraudulent, resulting in a charge-back to the CT Shingles Store.

d.   On or about November 1, 2018, DT-1 visited the DUODU Storage Unit, whereupon DT-1 met and spoke with MACK DUODU, the defendant.   DUODU stated in substance and in part, that:

14

      i. The 646 Phone Number belonged to DUODU.

      ii. DUODU rented and had exclusive access to the DUODU Storage Unit.

      iii. DUODU shipped items from New York to Nigeria and Ghana on behalf of various customers, and that he frequently stored said items at the DUODU Storage Unit prior to shipping them. As part of his business, DUODU stated that he purchased vehicles at auto auctions on behalf of his clients and also shipped those to West Africa.

      e.    While inside the DUODU Storage Unit, DT-1 observed a pallet containing HD-30 Mission Brown Timberline Roofing Shingles. DT-1 also observed a box containing a 65-inch curved television ("TV") with a United Parcel Service ("UPS") Ground shipping label attached to it, bearing a unique UPS shipping number (the "UPS TV Shipment").

      f.    Based on a review of records maintained by UPS, I have learned that the UPS Shipment was initially sent to the DUODU Yorktown Heights Residence.

      g.    Based on an interview conducted by DT-1 of a representative from an electronic store in Florida ("Electronic Store-1"), I have learned that in June 2018, an individual placed an order, by phone, with Electronic Store-1 for three 65-inch curved televisions. The purported purchaser paid for said televisions using a particular credit card, and requested that these TVs (i.e. the UPS TV Shipment) be shipped to the DUODU Yorktown Heights Residence. However, after sending the UPS TV Shipment to the DUODU Yorktown Heights Residence, Electronic Store-1 learned that the credit card used to finance the televisions was reported as fraudulent, resulting in a charge-back to Electronic Store-1.

      h.    Based on an interview by DT-1 of a representative at the Westchester Storage Unit ("Storage Rep-1") and a review of additional records provided by the Westchester Storage Unit, I have learned that on or about January 31, 2018, DUODU began a monthly rental the DUODU Storage Unit. On or about February 27, 2018, DUODU visited the front desk of the Westchester Storage Unit to make a monthly rental payment. On that date, DUODU provided a particular credit card number (the "Victim-4 Credit Card") to make said payment for $345.25 (the "February Rental Payment"). This payment initially went through. However, on or about March 20,

2018, the payment was reported as fraudulent, resulting in a charge-back to the Westchester Storage Unit.

   i. Based on an interview conducted by DT-1 of a representative at JP Morgan Chase Bank ("Chase"), I learned that the Victim-4 Credit Card was issued by Chase to a female client ("Victim-4").

   23. Based on an interview of Victim-4, I learned, among other things, that in March 2018, Victim-4 learned from Chase about a series of charges to the Victim-4 Credit Card that Victim-4 had not made or authorized. Victim-4 further stated that she did not know anyone named "Mack Duodu" and that Victim-4 did not authorize the February Rental Payment for the DUODU Storage Unit.

### The Romance Fraud/Money Laundering Scheme

   24. The Investigation further revealed that from at least in or about March 2018, up to and including at least November 2018, MACK DUODU, the defendant, controlled multiple bank accounts that were used to receive, launder, and transfer substantial proceeds of various romance fraud schemes (i.e. the Romance Fraud/Money Laundering Scheme). The Romance Fraud/Money Laundering Scheme generally worked as follows, with some variation between different manifestations of the scheme:

   a. A victim, typically someone between 60 and 80 years old (the "Romance Victim"), would meet a purported love interest online (the "Fraudster").

   b. The Fraudster would typically claim to be an American working abroad, for example, as a soldier deployed to the Middle East, or a medic performing humanitarian work.

   c. At some point, the Fraudster or one or more purported associates of the Fraudster (the "Third Party" or "Third Parties"), who were also fraudsters, would fabricate a reason for the Romance Victim to wire or otherwise transfer large amounts of money to various bank accounts, sometimes promising that these upfront payments would ultimately result in the Romance Victim receiving a windfall of money returned to the Romance Victim. For example, the Fraudster would claim that he came into a large sum of money, but in order to free-up the funds, the Romance Victim would first have to pay for certain taxes and fees upfront.

   d. The Romance Victim would then, at the instruction of the Fraudster or a Third Party, transfer large amounts of money

– often hundreds of thousands of dollars or more – to various bank accounts, some, but not all of which, were controlled by DUODU.

  e. Typically within several days of receiving funds from the Romance Victim, DUODU would transfer a significant portion of these funds to other bank accounts held domestically and/or abroad, including in Hong Kong, West Africa, or the United Arab Emirates. During the same time period, DUODU would dissipate the remaining funds by making cash withdrawals, or paying for business expenses, such as shipping fees to FF Company-1, in furtherance of the Stolen Goods Scheme.

  f. Invariably, the Romance Victim would go unpaid.

  25. Based on an interview of an approximately 61-year-old female Romance Fraud victim ("Victim-5"), I have learned that, among other things:

  a. In or about November 2017, Victim-5 began communicating online with an individual who claimed to be a male named "Jakes Hugh" ("Hugh"), who claimed to be a doctor, originally from Brooklyn, New York, that was working in Aleppo, Syria. Victim-5 and Hugh continued to communicate exclusively online and never met in-person.

  b. Through their communications, Hugh stated that he had all of his possessions and wealth in Syria, tied up in a particular securities company ("Securities Company-1"). Hugh claimed that he needed certain fees paid so he could access his holdings at Securities Company-1, and brokered an online introduction to Hugh's purported attorney, "Ambrose Escobar" ("Escobar").

  c. Thereafter, at Escobar's instructions, and in an attempt to help Hugh access his holdings at Securities Company-1, Victim-5 wired approximately $150,000 to various bank accounts, including $10,000 to a particular TD Bank Account held in the name of "Macs Autos." (the "Macs Autos TD Bank Account").

  26. Based on an interview of another approximately 54-year-old female Romance Fraud victim ("Victim-6"), I have learned, among other things, that:

  a. On or about July 29, 2018, Victim-6 met an individual on a particular dating website who claimed to be a male named "Daniel Sebastian" ("Sebastian"), who was preparing to leave the United States for a business project in South Africa.

b.    Sometime thereafter, Sebastian contacted Victim-6, stating, among other things, that he was in South Africa, had his money tied-up in a particular bank account, and needed Victim-6 to pay certain fees to free-up the account. Sebastian promised to repay Victim-6 for any money spent helping Sebastian regain access to his account.

c.    Thereafter, at the instruction of Sebastian, Victim-6 transferred approximately $45,000 to various bank accounts including $15,000, sent in October 2018 to the Macs Autos TD Bank Account.

d.    Victim-6 was never repaid for these transfers, and stopped receiving communications from Sebastian.

27.    A review of the records provided by TD Bank for the Macs Autos TD Bank Account revealed, among other things, that:

a.    The sole accountholder and signatory for the Macs Autos TD Bank Account is MACK DUODU, the defendant.

b.    On October 9, 2018, Victim-5 transferred $5,000 into the Macs Autos TD Bank Account.

c.    On October 12, 2018, DUODU withdrew $4,500 from cash from Macs Autos TD Bank Account.

d.    On October 15, 2018, Victim-5 transferred an additional $5,000 to the Macs Autos TD Bank Account.

e.    Also on October 15, 2018, Victim-6 transferred $15,000 to the Macs Autos TD Bank Account.

f.    On October 17, 2018, DUODU withdrew $1,000 in cash from the Mac's Autos TD Bank Account.

g.    On October 18, 2018, DUODU received a $5,000 cash deposit.

h.    Also on October 18, 2018, DUODU wired $20,000 to a company bank account in China.

i.    Further, on October 18, 2018, DUODU wired $4,500 to a bank account in Ghana.

18

j.    Taken together, between October 9, 2018 and October 18, 2018, the Macs Autos TD Bank Account received and dissipated $30,000.

28.    Based on an interview with another approximately 76-year-old victim of the Romance Fraud Scheme ("Victim-7"), I have learned, among other things, that:

a.    In or around early 2018, Victim-7 engaged in an online relationship with an individual claiming to be "Michael Tyler" ("Tyler"), who stated that he was an engineer working in Germany.  Tyler stated that Tyler's father-in-law had left Tyler's daughter $3 million in a bank account at "World Bank," in Texas, but that Tyler could not access the money unless certain fees were paid.

b.    Thereafter, Victim-7 began receiving emails from a Third Party, claiming to be a representative from "World Bank" (the "World Bank Third Party").  The World Bank Third Party's email address did not contain the words "World Bank."  The World Bank Third Party instructed Victim-7 to send cashier's checks to various addresses, including one address in Yorktown Heights, New York, and another address in Turkey.

c.    Victim-7 sent three cashier's checks, totaling $120,000 to the Yorktown Heights address and another approximately $150,000 worth of cashier's checks to an address in Turkey.

29.    Based on a review of records maintained by Wells Fargo, I have learned that:

a.    MACK DUODU, the defendant, held a Wells Fargo bank account in the name of "Mack A. Duodu doing business as Mac's Autos" (the "Mac's Autos Wells Fargo Account").  The sole accountholder and signatory for the Mac's Autos Wells Fargo Account is MACK DUODU, the defendant.

b.    On or about July 10, 2018, a $20,000 cashier's check issued by Victim-7 was deposited into the Mac's Autos Wells Fargo Account, along with several other deposits, including another cashier's check worth $1,240 from another individual whom I have not yet interviewed.

c.    On or about July 11, 2018, the Mac's Autos Wells Fargo Account wired approximately $20,970 to a company bank account in the United Arab Emirates.

d.    On or about August 1, 2018, two separate $50,000 cashier's checks (i.e. totaling $100,000) issued by Victim-7 were deposited into the Mac's Autos Wells Fargo Account.

e.    Between August 1, 2018 and August 7, 2018, over $82,000 was moved out of the Mac's Autos Wells Fargo Account including:

i. $1,000 in cash withdrawals;

ii. $20,000 in wire transfers to a company bank account in China;

iii. $50,000 in a wire transfer to a company in the United Arab Emirates;

iv. $2,700 in a wire transfer to Ghana; and

v. Over $8,400 in wires and transfers to FF Company-1.

30.    Based on an interview with another, approximately 81-year-old victim of the Romance Fraud Scheme ("Victim-8"), I have learned, among other things, that:

a.    In or about October 2018, Victim-8 was induced to wire $10,000 to the Mac's Autos Wells Fargo Account.  Victim-8 was led to believe that this transfer was for the benefit of an individual named Harold Greene, who claimed to be a general in the United States Army stationed in Afghanistan ("General Greene").

b.    General Greene indicated that he won a significant cash award, but first needed to pay $10,000 in fees. General Greene requested that $10,000 be wired to the Mac's Autos Wells Fargo Account.

31.    In October 2018, Victim-8 visited two separate Wells Fargo branches in an attempt to wire $10,000 to the Mac's Autos Wells Fargo account, but Victim-8's wire attempts were rejected by bank managers on both occasions.

32.    Based on an interview of a representative from Wells Fargo ("WF Rep-1"), I have learned the following:

a.    On October 3, 2018, Victim-8 entered a particular branch of Wells Fargo attempting to send a $10,000 wire to the Mac's Autos Wells Fargo Account.  Victim-8 explained to the bank

manager ("Manager-1") that Victim-8 understood Mac's Autos to be a company affiliated with a General Harold Greene who was stationed in Afghanistan. Manager-1 was unwilling to authorize the transaction, noting that internal Wells Fargo records showed that Mac's Autos was a used car lot affiliated with MACK DUODU. Victim-8 thereafter visited a second Wells Fargo branch and attempted to send the wire to the Mac's Autos Wells Fargo Account via a different branch manager ("Manager-2"). Manager-2 also refused to authorize the transaction.

> b.  On October 5, 2018, WF Rep-1 contacted MACK DUODU, the defendant, at the 646 Phone Number, inquiring about Victim-8's attempts to wire $10,000 to the Mac's Autos Wells Fargo Account (the "October 5 WF Call"). DUODU stated, in substance and in part, that the $10,000 wire was for a client in Ghana who was purchasing a car and needed a friend in the United States to make the deposit. WF Rep-1 further asked DUODU about other suspicious deposits into the Mac's Autos Wells Fargo Account. DUODU stated in substance that he could not recall the names of all of his clients, but that all of the deposits were for cars. WF Rep-1 informed DUODU that his version of events did not match that of Victim-8, and that Wells Fargo would be closing the account due to fraud.

> c.  On or about October 19, 2018, Wells Fargo officially closed the Mac's Autos Wells Fargo Account as well as a second account belonging to DUODU: "Mack A. Duodu doing business as 'International Trading Places'" (the "International Trading Places Wells Fargo Account").

> 33.  A review of public sourcing, including Wikipedia, reveals that Harold Joseph Greene was a United States Army general who was killed during battle in Afghanistan in 2014.

> 34.  A review of records maintained by Chase Bank reveals that on October 5, 2018 (i.e. the same date of the October 5 WF Call, when MACK DUODU, the defendant, was informed that his Wells Fargo accounts would be closed), DUODU opened a bank account at Chase Bank in the name of "Mack Awkwasi Duodu, doing business as 'International Trading Places'" (the "International Trading Places Chase Account").

> 35.  I am informed by another approximately 60-year-old victim of the Romance Scheme ("Victim-9") that in or around July 2018, Victim-9 met an individual online who claimed to be "John Williams" ("Williams"), a pediatric doctor, originally from the United States, working in Syria. During their communications,

Williams stated that he was arrested at an airport in Syria because he failed to declare that he was transporting gold bars from the country. Williams stated that he needed money to be able to get out of jail and pay taxes for the gold, but that he would repay Victim-9 upon returning to the United States. At Williams' instruction, Victim-9, using a company bank account (the "Victim-9 Company Account"), wired approximately $100,000 to various bank accounts including two wires, both sent on October 1, 2018, totaling $68,000, to the International Trading Places Wells Fargo Account. Victim-9 was never reimbursed for this money and never met Williams.

36. A review of records maintained by Wells Fargo for the International Trading Places Wells Fargo Account reveals that, among other things:

    a.   The International Trading Places Wells Fargo Account lists MACK DUODU, the defendant, as the sole signatory.

    b.   On or about October 1, 2018, two wires – worth $40,000 and $28,000, respectively – were sent from the Victim-9 Company Account to the International Trading Places Wells Fargo Account.

    c.   On or about October 2, 2018:

        i. DUODU made a $2,000 cash withdrawal;

        ii. The International Trading Places Wells Fargo Account wired approximately $45,790 to a company bank account in the United Arab Emirates; and

        iii. The International Trading Places Wells Fargo Account wired approximately $20,000 to a company bank account in China.

37. Based on an interview with another, approximately 64-year-old victim of the Romance Fraud Scheme ("Victim-10"), I have learned that in May 2018, Victim-10 met an individual claiming to be "James Sullivan" ("Sullivan") on a dating website. Sullivan claimed he was born in France, moved to North Carolina, and by May 2018 was living in the United Kingdom and working for a particular investment company. Sometime thereafter, Sullivan informed Victim-10 that Sullivan quit his job and went to Dubai, where he brokered an oil deal worth $11 million. Sullivan stated that he needed to conduct the deal in Victim-10's name because of "legal issues." Sullivan further stated that the $11 million was

deposited at Unison Bank in the United Kingdom. Victim-10 was later informed that the account balance was reduced to $6.8 million due to a drop in oil prices. Thereafter, Victim-10 was contacted by a Third Party, who claimed to be a representative at Unison Bank (the "Unison Account"). The Third Party told Victim-10 that the "Unison Account" was opened but that Victim-10 would need to pay a one-percent of the account's balance to access the account. Thereafter, Victim-10 directed a $68,100 payment to an account at the instruction of the Third Party. In the months that followed, up to and including December 2018, Victim-10 made numerous additional wire transfers to various bank accounts at the instruction of the Third Party – including over $250,000 via two wire transfers to the International Trading Places Chase Account – in an attempt to resolve various purported fees associated with the Unison Account. Victim-10 states that she transferred over $1.6 million at the instruction of Sullivan and the Third Party, and was never reimbursed.

            38. Based on a review of records maintained by Chase Bank for the International Trading Places Chase Account, I have learned, among other things, that:

            a.    MACK DUODU, the defendant, is the sole signatory on the International Trading Places Chase Account.

            b.    On or about October 18, 2018, Victim-10 wired $142,500 to the International Trading Places Chase Account. On the same date, the International Trading Places Chase Account received a cash deposit for approximately $5,250.

            c.    Between October 18, 2018 and October 29, 2018, approximately $143,229 left the International Trading Places Chase Account, including through the following transactions:

                  i. Over   $43,229   through   multiple   cash withdrawals;

                  ii. A $70,000 wire transfer to a company bank account in China; and

                  iii. A $30,000 wire transfer to a company bank account in the United Arab Emirates.

            d.    On or about November 16, 2018, Victim-10 wired $115,000 to the International Trading Places Chase Account.

e.   On or about November 20, 2018, the International Trading Places Chase Account conducted a $100,000 wire transfer to a company bank account in China and a $15,000 wire transfer to a company bank account in the United Arab Emirates.

WHEREFORE, the deponent respectfully requests that MACK DUODU, the defendant, be imprisoned, or bailed, as the case may be.

MICHAEL H. MACDONALD
Special Agent
Homeland Security Investigations

Sworn to before me this
12th day of March 2020.

THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK